STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES and Tom Irwin, Commissioner of Natural Resources, Petitioners,

v.

NONDALTON TRIBAL COUNCIL, Koliganek Village Council, New Stuyahok Traditional Council, Ekwok Village Council, Curyung Tribal Council, Levelock Village Council, AIFMA Cooperative Inc. d/b/a The Alaska Fishermen's Marketing Association, and Trout Unlimited, Inc., Respondents.

No. S–13681.

Supreme Court of Alaska.

Jan. 20, 2012.

**294**

J. Anne Nelson, Assistant Attorney General, John T. Baker, Senior Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Petitioners.

Geoffrey Y. Parker, Law Office of Geoffrey Y. Parker, and Thomas E. Meacham, Anchorage, for Respondents.

Samuel J. Fortier and Rachel Lauesen, Fortier & Mikko, P.C., Anchorage, for Amicus Curiae Alaska Peninsula Corporation.

Peter Van Tuyn, Bessenyey and Van Tuyn, LLC, Anchorage, and Valerie L. Brown, Law Office of Valerie Brown, LLC, Anchorage, for Amicus Curiae Bristol Bat Native Corporation.

1. Ch. 181, § 5, SLA 1978, codified at AS 38.04.

2. Alaska Statehood Act, Pub. L. No. 85–508, § 6(a)-(b), 72 Stat. 339, 340 (1958); Alaska Native Claims Settlement Act, Pub.L. No. 92–293, § 11(a), 85 Stat. 688, 696 (1971) (codified at 43 U.S.C. § 1610(a) (2006)); *see also Alaska v. Native Vill. of Venetie Tribal Gov't,* 522 U.S. 520, 524, 118 S.Ct. 948, 140 L.Ed.2d 30 (1988).

Before: CARPENETI, Chief Justice, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

STOWERS, Justice.

## I. INTRODUCTION

Six tribal councils, joined by two other associations (collectively "the Tribes"), filed an action against the State of Alaska, Department of Natural Resources (DNR) in the superior court in Dillingham seeking declaratory judgment that the 2005 Bristol Bay Area Plan (BBAP, the Plan) was unlawful. DNR's motion to dismiss under Civil Rule 12(b)(6) was denied and the superior court held that: (1) the BBAP is a regulation that must be promulgated under the Alaska Administrative Procedure Act (APA), and (2) Alaska Appellate Rule 602(a)(2)—which provides for a 30-day period in which to appeal a final agency decision—does not bar the Tribes' claims. We granted DNR's petition for review and now hold Appellate Rule 602(a)(2) does not bar the Tribe's claims and the BBAP is not a regulation.

## II. FACTS AND PROCEEDINGS

### A. Land Use Planning In Alaska: History And Regulatory Landscape

DNR develops land use plans for state land pursuant to the Policy for Use and Classification of State Land Surface (Alaska Land Policy Act), which was enacted in 1978.[1] At that time, the State's efforts to select its 103,350,000–acre statehood entitlement were complicated by, and partially subordinated to, the rights of Alaska Natives under the 1971 Alaska Native Claims Settlement Act (ANCSA) to select approximately 44 million acres of land.[2] ANCSA also called for the federal withdrawal of up to 80 million acres of unreserved public land for inclusion in the national conservation system.[3] Addi-

3. Alaska Native Claims Settlement Act, Pub. L. No. 92–293, § 17(d)(2), 85 Stat. at 709 (codified at 43 U.S.C. § 1616(d)(2) (2006)). These became known as "the d–2 lands." *See, e.g., State v. Andrus,* 429 F.Supp. 958, 963 (D.Alaska 1977). The status of these lands was not resolved until after Congress enacted the Alaska National Interest Land Conservation Act in 1980. *See* Alaska National Interest Lands Conservation Act, Pub.

tionally, local governments sought to finalize their municipal land entitlements.[4] The State also faced intense pressure from its citizens to move state land into private ownership.[5] Beyond Article VIII of the Alaska Constitution[6] and the land use classification statute,[7] no large-scale planning program for the management of state lands existed at that time.[8]

ANCSA established the Joint Federal–State Land Use Planning Commission for Alaska (FSLUPC) to, among other things, "undertake a process of land-use planning" and "make recommendations ... to ... the Governor and legislature of the State as to changes in laws, policies and programs that the Planning Commission determines are necessary or desirable."[9] To that end, the FSLUPC recommended that Alaska's land classification system, which had been in existence since statehood and focused on "disposing of lands into private ownership and on producing revenue," be revised to be based instead on "an area wide comprehensive planning process" and "the best possible knowledge of land resources and their interrelationships."[10]

The Alaska Land Policy Act[11] translates the constitutional policies of Article VIII of the Alaska Constitution into specific land management goals to guide DNR's land management decisions. It incorporates many of the recommendations of the FSLUPC, and is modeled in large part after the land planning provisions in the Federal Land Policy and Management Act of 1976.[12]

DNR is charged with managing the replenishable state resources under its jurisdiction in accordance with "the sustained yield principle, subject to preferences among beneficial uses."[13] The Alaska Land Policy Act guides DNR by establishing the purposes and goals of making land available for private use, and for retaining state land in public ownership.[14] It also prescribes that disposal and retention decisions be "determined through the inventory, planning, and classifications processes set out in AS 38.04.060–38.04.070."[15] The inventory of state land and water resources must emphasize "areas of potential settlement, economic development, and critical environmental concern."[16] In the adoption and revision of land use plans, DNR must:

(1) use and observe the principles of multiple use and sustained yield;

(2) consider physical, economic, and social factors affecting the area and involve other

Law. No. 96–487, §§ 101 et. seq., 94 Stat. 2371, 2374 (1980) (codified at 16 U.S.C. §§ 3101 et seq. (2006)).

4. Joint Federal–State Land Use Planning Commission, Agenda for State Lands: Recommendations to the People of Alaska on the Future of Their Public Lands, Part I, Recommendation 7 & Part II 48–50 (Dec. 1975) (hereinafter FSLUPC, Agenda for State Lands).

5. See Thomas v. Bailey, 595 P.2d 1, 2–4 (Alaska 1979) for a description of the "Beirne Initiative," which Governor Hammond characterized as "a vast land give-away which could create an Oklahoma land rush in Alaska." 1978 Alaska House J. 629.

6. Article VIII, section 2 of the Alaska Constitution provides for the "utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people."

7. AS 38.04.065.

8. FSLUPC, Agenda for State Lands, Part II, 19–38 (Dec. 1975).

9. 43 U.S.C. § 1616(a)(7)(A) & (H) (1976). The FSLUPC ceased to exist on June 30, 1979. See id. § 1616(a)(10). Subsection (a) is omitted from the current version of this statute. See 43 U.S.C. § 1616 (2006).

10. FSLUPC, Agenda for State Lands, Part I, Recommendations 1(a) and 2 (Dec. 1975).

11. Codified at AS 38.04.

12. Federal Land Policy and Management Act of 1976, Pub. L. No. 94–579, 90 Stat. 2743, 2744 (codified at 43 U.S.C. §§ 1701 et seq. (2006)). Compare 43 U.S.C. §§ 1711, 1712 with AS 38.04.060 & .065.

13. Alaska Const. art. VIII, § 4.

14. AS 38.04.010 identifies the public interest in making land available for private use. AS 38.04.015 identifies the purposes for which state land is to be retained in public ownership.

15. AS 38.04.005(a).

16. AS 38.04.060(a).

agencies and the public in achieving a systematic interdisciplinary approach;

(3) give priority to planning and classification in areas of potential settlement, renewable and nonrenewable resource development, and critical environmental concern;

(4) rely, to the extent that it is available, on the inventory of the state land, its resources, and other values;

(5) consider present and potential uses of state land;

(6) consider the supply, resources, and present and potential use of land under other ownership within the area of concern;

(7) plan for compatible surface and mineral land use classifications; and

(8) provide for meaningful participation in the planning process by affected local governments, state and federal agencies, adjacent landowners, and the general public.[17]

Each regional plan must also identify and delineate:

(1) areas of settlement and settlement impact, where land must be classified for various private uses, renewable and nonrenewable resource development, and for public recreation, open space, and other public uses desirable in and around settlement; and

(2) areas that must be retained in state ownership and planned and classified for various uses and purposes under AS 38.04.015.[18]

The state land use planning process also must result in the classification of land for surface use.[19] Land classification orders are statutorily exempt from the APA.[20] The definitions of the various land classification categories, however, are set out in regulations.[21]

In sum, DNR adopts and revises state land use plans under AS 38.04, AS 38.05.300, and the regulations at 11 AAC 55. DNR implements land use plans pursuant to the statutory policy "to establish a balanced combination of land available for both public and private purposes."[22] "The choice of land best suited for public and private use shall be determined through . . . inventory, planning, and classification processes."[23]

## B. The Bristol Bay Area Plan

DNR adopted the BBAP on April 19, 2005 [24] after a two-year development process, replacing a 1984 version of the plan. The Plan "directs *how [DNR] will manage* state uplands, shorelands, tidelands, and submerged lands within the planning boundary," and "determines *management intent,* land-use designations, and *management guidelines* that apply to all state lands in the planning area." (Emphasis added.) The BBAP is one of 20 area plans in Alaska.[25]

The BBAP covers almost 19 million acres partitioned into 20 discrete regions of land, each subdivided into units.[26] For each re-

17. AS 38.04.065(b). These requirements largely mirror those in the Federal Land Policy and Management Act of 1976. *See* 43 U.S.C. § 1712 (2006).

18. AS 38.04.065(c).

19. AS 38.04.065(e); AS 38.05.300. With limited exceptions, neither state land nor state interests in land may be disposed of until the land has been classified. 11 Alaska Administrative Code (AAC) 55.040(i) (2005).

20. AS 38.05.020(b)(1) ("[O]rders by the commissioner classifying land, issued after January 3, 1959, are not required to be adopted under AS 44.62 (Administrative Procedure Act).").

21. 11 AAC 55.050–.230. For discussions of the land use planning process, see *Alaska Survival v. State,* 723 P.2d 1281, 1289–91 (Alaska 1986).

22. AS 38.04.005(a).

23. *Id.*

24. DEPARTMENT OF NATURAL RESOURCES, BRISTOL BAY AREA PLAN FOR STATE LANDS (2005), *available at* http://dnr.alaska.gov/mlw/planning/areaplans/bristol/index.htm (last visited Jan. 4, 2012) ("The Commissioner of the Department of Natural Resources adopts the revised Bristol Bay Area Plan (2005) and finds that it meets the requirements of AS 38.04.065 and 11 AAC 55.010–55.030 for land use plans. The Department of Natural Resources will manage state land within the planning boundaries consistent with this plan.").

25. *See* Area Plans Online, http://dnr.alaska.gov/mlw/planning/areaplans/ (last visited Jan. 4, 2012).

26. Note that regions are numbered one through 22, but regions one and four do not exist.

gion, the BBAP presents three types of information: (1) an inventory and description of resources; (2) a management summary and guidelines; and (3) statements of management intent for each planning unit within the region. The Plan as a whole is "the expression of how DNR will pursue" management of "state lands and resources within the planning area." Specifically, "[t]he area plan guides DNR decisions for leases, sales, and permits that authorize use of state lands.... DNR's actions will be based on the area plan."

The BBAP is a long-term planning document with an expected lifespan of 20 years. The required public involvement in the planning process took place over two years, and involved local meetings and opportunity for public comment.[27] To implement the Plan on state lands, "DNR must 'classify' state lands to reflect the intent of 'land use designations' made by [the Plan]," [28] which it did through Land Classification Order No. SC–04–002, also on April 19, 2005.

## C. Proceedings

On May 5, 2009, four tribal councils [29] filed suit in the superior court in Dillingham against DNR and its commissioner, Tom Irwin. An amended complaint added two more

tribal councils as plaintiffs,[30] and a second amended complaint added two additional plaintiff organizations.[31] Collectively, we refer to these plaintiffs/respondents as "the Tribes."

The Tribes' amended complaint alleged eight causes of action; the seven at issue here (counts 1 and 3–8) challenged provisions of the BBAP itself.[32] In essence, the Tribes alleged that DNR unlawfully adopted the BBAP, and sought declaratory judgment that the BBAP was "of no continuing legal force and effect."

DNR moved under Civil Rule 12(b)(6) to dismiss the amended complaint for failure to state a claim upon which relief could be granted. DNR argued that the seven causes of action at issue here were barred because they were not brought within the proper limitations period, and that they were functionally administrative appeals that should have been raised before the agency. Specifically, DNR alleged that because the Tribes sought review of DNR's decision, their claims should be treated as an appeal from an agency determination and barred 30 days following issuance of the determination under Appellate Rule 602(a)(2).[33] DNR also noted that the Tribes had not exhausted their administrative remedies because the Tribes

27. See AS 38.04.065(a) (providing for "local governmental and public involvement" in adopting or revising land use plans); AS 38.05.945 (listing notice requirements); 11 AAC 55.250 (specifying notice and either public hearing or solicitation of public comment).

28. See 11 AAC 55.040.

29. Nondalton Tribal Council, Koliganek Village Council, New Stuyahok Traditional Council, and Ekwok Village Council.

30. Curyung Tribal Council and Levelock Village Council.

31. AIFMA Cooperative d/b/a the Alaska Independent Fisherman's Marketing Ass'n, and Trout Unlimited, Inc.

32. Count 2 alleged that DNR's adoption of land classification categories at 11 AAC 55.050–.230 for all uses listed in AS 38.04.015(1) except subsistence violated AS 38.04.065, AS 38.04.015, and AS 38.05.300. The superior court ruled separately on this count, granting the State's motion to dismiss. This count was not part of the petition for review and is not on appeal. A

separate ninth cause of action, alleging that DNR abused its discretion in adopting the BBAP, was added in the Second Amended Complaint, filed after the superior court decision on appeal here.

33. Alaska R.App. P. 602(a)(2) provides:

(2) *Appeals from Administrative Agencies.* An appeal may be taken to the superior court from an administrative agency within 30 days from the date that the decision appealed from is mailed or otherwise distributed to the appellant. If a request for agency reconsideration is timely filed before the agency, the notice of appeal must be filed within 30 days after the date the agency's reconsideration decision is mailed or otherwise distributed to the appellant, or after the date the request for reconsideration is deemed denied under agency regulations whichever is earlier. The 30–day period for taking an appeal does not begin to run until the agency has issued a decision that clearly states that it is a final decision and that the claimant has thirty days to appeal. An appeal that is taken from a final decision that does not include such a statement is not a premature appeal.

could have challenged the BBAP by petitioning DNR to reclassify land under AS 38.05.300(a) and 11 AAC 55.270, and ultimately could have sought judicial review of that determination.

The Tribes responded by arguing that the BBAP was a regulation as defined by the APA[34] and therefore was subject to judicial review at any time under AS 44.62.300.[35] The Tribes further argued that Appellate Rule 602(a)(2) only applies when an agency acts in an adjudicatory capacity and therefore does not bar their claims in this case, and also that they were not parties to the decision and therefore were not bound by the rule's 30–day limit because they did not participate in the process that resulted in DNR's adoption of the BBAP. Finally, the Tribes argued that they were not required to exhaust administrative remedies before filing suit because: (1) adoption of the BBAP was not adjudicatory; (2) seeking reclassification was an inappropriate remedy because the Tribes did not seek to reclassify land; and (3) the Tribes were not challenging any particular classification of land, but rather claimed that DNR committed errors of law—and as such, there were no facts to develop, no agency expertise to apply, and administrative remedies were inappropriate.

DNR filed a reply in support of its motion to dismiss, arguing that land use plans are not regulations because they implement

DNR's quasi-executive discretion[36] and are therefore not open to challenge under APA judicial review. DNR attached to its reply a 2008 decision by Superior Court Judge Beverly Cutler ruling that a statutorily directed forest management plan was not a regulation under AS 44.62.640(a)(3).

Superior Court Judge Fred Torrisi denied DNR's motion to dismiss and concluded that the BBAP was a regulation under AS 44.62.640 and therefore was subject to judicial review under AS 44.62.300.[37] The court also found that DNR had cited no precedent for applying Appellate Rule 602(a)(2) to bar a claim by someone who was not a party to the administrative proceeding at issue.

DNR petitioned this court for interlocutory review, arguing the superior court's decision that a statutorily mandated land use plan is a regulation was incorrect, and that it would lead to widespread judicial challenges to such plans and introduce uncertainty in state land planning activities. DNR also challenged the superior court's Appellate Rule 602 decision.

The Tribes opposed granting the petition for review, arguing *inter alia* that the decision applied only to the BBAP and not to all land use plans, and that the superior court was correct in finding that the BBAP was a regulation.

The superior court stayed its proceedings pending the resolution of the State's petition. Additionally, Pebble Limited Partnership

**34.** The APA defines "regulation" in AS 44.62.640(a)(3) as follows:
(3) "regulation" means every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency; "regulation" does not include a form prescribed by a state agency or instructions relating to the use of the form, but this provision is not a limitation upon a requirement that a regulation be adopted under this chapter when one is needed to implement the law under which the form is issued; "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretative bulletins," "interpretations," and the like, that have the effect of rules, orders, regulations, or standards of general application, and this and similar phraseology may not be used to avoid or circumvent this chapter; whether a

regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public[.]

**35.** AS 44.62.300 provides in relevant part that "[a]n interested person may get a judicial declaration on the validity of a regulation by bringing an action for declaratory relief in the superior court."

**36.** DNR claimed that land use plans are committed to DNR's discretion by AS 38.04.065(a), which provides that "the commissioner shall, with local governmental and public involvement under AS 38.05.945, adopt, maintain, and, when appropriate, revise regional land use plans that provide for the use and management of state-owned land."

**37.** This decision addressed only the seven counts at issue here; count 2 was separately dismissed in another ruling.

moved to intervene as a defendant in the superior court, but the case was stayed before oral argument was heard on this motion, and it does not participate in this appeal.

We granted the petition for review on the issues whether the BBAP is a regulation and whether Appellate Rule 602 bars the Tribes' action.

## III. DISCUSSION

### A. Standard of Review

■ Whether an agency action is a regulation is a question of law that does not involve agency expertise, which we review applying our independent judgment.[38] Specifically, evaluating whether agency action falls within the statutory definition of a regulation is a question for the court's specialized knowledge and experience.[39]

■ We note that the more deferential standards of review sometimes reserved for agency interpretations are inappropriate here. As we explained in *Jerrel v. State,* "[T]he threshold question in this case is whether the APA applies to DNR's action [at all]. Because we must decide whether DNR's [action] is a regulation, we do not defer to the agency's interpretation." [40]

We interpret Appellate Rule 602 de novo.[41]

### B. Appellate Rule 602 Does Not Bar The Tribes' Action Because The BBAP Is Not A Final Agency Decision, And Because It Lacks The Requisite 30-Day Notice To Trigger Rule 602.

DNR argues that the Tribes' action is barred by Appellate Rule 602. Appellate Rule 602(a)(2) requires that appeals to the superior court taken from administrative decisions be made within 30 days "from the date that the decision appealed from is mailed or otherwise distributed to the appellant."

■ By filing suit more than four years after the BBAP was adopted, the Tribes clearly failed to meet the 30-day limit. The question is whether Appellate Rule 602 applies to bar their action.

Rule 602(a)(2) provides:

> The 30-day period for taking an appeal does not begin to run until the agency has issued a decision that *clearly states that it is a final decision and that the claimant has thirty days to appeal.* An appeal that is taken from a final decision that does not include such a statement is not a premature appeal.[42]

We have interpreted this language strictly, and made explicit that "[f]or Appellate Rule 602(a)(2) to apply, an agency must clearly indicate that its decision is a final order and that the claimant has thirty days to appeal." [43] We have held that the superior court abused its discretion in refusing to relax the 30-day limit under Rule 602(a)(2) when an agency decision letter failed to include these required elements.[44] Provided the agency decision meets these criteria, however, we have strictly enforced the 30-day bar, even against would-be appellants who attempt to file an appeal mere days

---

**38.** *Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation,* 145 P.3d 561, 564 (Alaska 2006) ("Whether an agency action is a 'regulation' requiring rulemaking under the Alaska Administrative Procedure Act is a question of law that does not involve agency expertise and that we therefore review applying our independent judgment."); *see also Burke v. Houston NANA, L.L.C.,* 222 P.3d 851, 867 (Alaska 2010); *Alaska Ctr. for the Env't v. State,* 80 P.3d 231, 243 (Alaska 2003); *Jerrel v. State, Dep't of Natural Res.,* 999 P.2d 138, 141 (Alaska 2000); *Kachemak Bay Watch, Inc. v. Noah,* 935 P.2d 816, 821, 825 (Alaska 1997).

**39.** *Jerrel,* 999 P.2d at 141.

**40.** *Id.* (citing *Kelly v. Zamarello,* 486 P.2d 906, 911 (Alaska 1971)).

**41.** *See Stone v. State,* 255 P.3d 979, 982 (Alaska 2011) (citing *Cameron v. Hughes,* 825 P.2d 882, 884 n. 2 (Alaska 1992)) ("We interpret Alaska Appellate Rules de novo.").

**42.** Alaska R.App. P. 602(a)(2) (emphasis added).

**43.** *Manning v. Alaska R.R. Corp.,* 853 P.2d 1120, 1124 (Alaska 1993); *see also Skudrzyk v. Reynolds,* 856 P.2d 462, 463 (Alaska 1993) (quoting *Manning,* 853 P.2d at 1124).

**44.** *Manning,* 853 P.2d at 1124.

after the deadline.[45]

Neither the BBAP nor its associated Land Classification Order state that they are final decisions or that affected parties have 30 days in which to appeal them. In fact, the BBAP effectively states that it is *not* a final decision.[46] Moreover, DNR has neither argued nor offered evidence that either of these "decisions" were "mailed or otherwise distributed" to the Tribes.[47]

Because the BBAP and its associated land classification order lack explicit notice of their finality and of the 30-day period in which to appeal, the BBAP is not a final decision and Appellate Rule 602(a)(2) does not bar the Tribes' claims.

### C. The Bristol Bay Area Plan Is Not A Regulation.

### 1. Land use plans such as the BBAP are neither required to be nor precluded from being adopted as regulations by statute.

DNR argues that land use classifications—and by extension land use plans—are explicitly defined as non-regulatory in AS 38.05.020(b)(1), which states "orders by the commissioner classifying land ... are not required to be adopted under [the APA]." The Tribes counter that the aforementioned statutory language refers only to *land classification orders*, not to *land use plans* such as the BBAP.

Although the legislature specified that land classifications "are not required to be adopted" under the APA,[48] this does not necessarily preclude their adoption as regulations, nor does it speak directly to land use plans.[49] Therefore, the applicable statutory language does not resolve the issue whether

land use plans are regulations, and we must look to the statutory definition of "regulation" in combination with case law to determine whether the BBAP is a regulation.

### 2. The BBAP is not a regulation under the APA definition.

The Tribes argue, and the superior court held, that the BBAP is a "regulation" under the APA. DNR disagrees.

The APA defines "regulation" broadly in AS 44.62.640(a)(3) to include:

> every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule, regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency.

Moreover, the label an agency attaches to the policy in question is not determinative:

> "regulation" includes "manuals," "policies," "instructions," "guides to enforcement," "interpretative bulletins," "interpretations," and the like, that have the effect of rules, orders, regulations, or standards of general application, *and this and similar phraseology may not be used to avoid or circumvent this chapter;* whether a regulation, regardless of name, is covered by this chapter depends in part on whether it affects the public or is used by the agency in dealing with the public.[50]

■ Although the statutory definition of "regulation" in the APA is broad, we have noted that "it does not encompass every agency practice or decision."[51] To determine whether the BBAP is a regulation we

---

45. *See Powers v. State, Pub. Emps. Retirement Bd.,* 757 P.2d 65, 68 (Alaska 1988) (upholding 30-day bar when appeal was four days late).

46. *See, e.g.,* BBAP, Summary of Plan Actions, 1–11 ("Specific modifications [to the BBAP] may be made whenever conditions warrant them."); BBAP, Types of Plan Changes (listing the various types of changes envisioned).

47. Alaska R.App. P. 602(a)(2).

48. AS 38.05.020(b)(1).

49. Land use plans and land classification are closely related. Land classification is statutorily directed alongside land use plans in AS 38.04.065, and a land classification order implements the guidelines in a land use plan, often explicitly incorporating the applicable land use plan as justification.

50. AS 44.62.640(a)(3) (emphasis added).

51. *Kachemak Bay Watch, Inc. v. Noah,* 935 P.2d 816, 825 (Alaska 1997).

must look to two indicia: (1) whether the BBAP implements, interprets, or makes specific the law enforced or administered by the agency; and (2) whether the BBAP affects the public or is used by the agency in dealing with the public.[52]

The BBAP satisfies the first indicium because it "implement[s], interprets[,] or make[s] specific the law enforced or administered" by DNR.[53] In fact, this is the essence of the Plan—it distills the factors set forth in AS 38.04.065 into a plan for a specific geographic region. The parties agree that this indicium is not at issue in this case.

The second indicium—the degree to which agency action must affect the public to qualify as a regulation—poses a nuanced question. In order to answer this question, we begin by reviewing two prior cases that addressed this question: *Kenai Peninsula Fisherman's Cooperative Association, Inc. v. State (Kenai)*,[54] and *Kachemak Bay Watch, Inc. v. Noah (Kachemak)*.[55]

### a. *Kenai Peninsula Fisherman's Cooperative Association, Inc. v. State (1981)*

In *Kenai*, we held that the Board of Fisheries' management policies for Upper Cook Inlet were regulations as defined by the APA.[56] At issue in *Kenai* were a "comprehensive management policy and a specific policy option" implemented by the Board of Fisheries to address frequent competition

over salmon stocks between commercial and recreational fishermen in the Cook Inlet.[57] The management *policy* effectively partitioned the salmon fisheries by species and by time between the two groups,[58] whereas the *policy option* directed the closure of the Kenai commercial fishery if its late-season catch was below average.[59] The year after the management policy and policy option were announced, the Board of Fisheries promulgated regulations based upon these directives.[60]

Plaintiff, a fisherman's cooperative association, challenged the management policy and policy option on various grounds, including alleging that they were in effect regulations and therefore ought to have been adopted under the APA.[61] Similar to DNR's position in this appeal, the Board of Fisheries in *Kenai* asserted that the management policy and policy option were not regulations but instead "merely general guidelines, adopted for the convenience of the public and other state agencies, to inform them of the Board's thinking on critical management issues in areas within its delegated authority."[62]

Noting that "the label placed on a particular statement by an administrative agency does not determine the applicability of the APA,"[63] and that the broad definition of "regulation" in AS 44.62.640 encompassed "many statements made by administrative agencies, including policies and guides to en-

---

52. *Id.* (citing *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1197 (Alaska 1995); *Gilbert v. State, Dep't of Fish & Game*, 803 P.2d 391, 396 (Alaska 1990)); *see also Burke v. Houston NANA, L.L.C.*, 222 P.3d 851, 867 (Alaska 2010); *Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 243 (Alaska 2003); *Jerrel v. State, Dep't of Natural Res.*, 999 P.2d 138, 143–44 (Alaska 2000). These criteria are derived from related language in the definition of regulation under the APA at AS 44.62.640(a)(3).

53. AS 44.62.640(a)(3); *Kachemak*, 935 P.2d at 825.

54. 628 P.2d 897 (Alaska 1981).

55. 935 P.2d 816 (Alaska 1997).

56. 628 P.2d at 899.

57. *Id.*

58. The policy provided, among other things, that:

1. [Salmon] Stocks which normally move in the Cook Inlet to spawning areas prior to June 30, shall be managed primarily as a non-commercial resource.
2. [Salmon] Stocks which normally move in Cook Inlet after June 30, shall be managed primarily as a non-recreational resource until August 15....
*Id.* at 900 n. 3.

59. *Id.*

60. *Id.* at 901.

61. *Id.* at 904.

62. *Id.*

63. *Id.* at 905.

forcement," [64] we assessed whether the management policy and policy option fit both indicia of a regulation.[65]

With respect to the second indicium—namely, the extent to which the policy and policy option affected the public or were used by the agency in dealing with the public—we found that "the policy and the option served as a basis for decisions affecting commercial and recreational fishermen and were used by the Board in dealing with these groups." [66] We cited two main examples in support of this conclusion: first, that the policy option actually resulted in the emergency closure of the Kenai fishery in September 1978; and second, that the management policy influenced and was cited as justification for regulations promulgated later.[67]

Because they satisfied both the broad APA definition and the first indicium of a regulation,[68] we concluded that "the policy and the option make specific management policies ... and have the effect of regulations or standards of general application.... As such, they are regulations." [69]

### b. *Kachemak Bay Watch, Inc. v. Noah* (1997)

In *Kachemak*, we held that DNR's identification of aquatic farm districts was not a regulation.[70] At issue in *Kachemak* was the districting process itself: Alaska Statute 38.05.855(a) required DNR to "identify dis-

tricts in the state within which sites [could] be selected for the establishment and operation of aquatic farms and related hatcheries." [71] Once designated, DNR would consider applications for aquaculture permits within each district.[72] Plaintiff Kachemak Bay Watch argued that DNR was obliged to define these districts by regulation as opposed to internal decision-making.[73]

As in *Kenai*, we began by noting that the APA definition of a regulation is broad, and that the particular label an agency applied to its action would not preclude a finding that it was in fact a regulation.[74] We then focused on the second indicium of a regulation—again, "whether the practice affects the public or is used by the agency in dealing with the public." [75]

We observed that " '[a]gencies often make discretionary decisions not requiring formal procedures,' " which we described as "quasi-executive." [76] We stated that DNR itself "regularly makes decisions that are quasi-executive in nature and do not constitute regulation[s] under the APA *even when one or more indices of a regulation are present.*" [77] We noted several examples of such decisions,[78] and pointed out that the identification of districts involved the exercise of agency discretion,[79] and, moreover, that "[n]o ... express requirement for regulations exists for the district identification process and

---

**64.** *Id.* at 904–05.

**65.** *Id.* at 905.

**66.** *Id.*

**67.** *Id.* at 905–06.

**68.** *Id.* at 905.

**69.** *Id.* at 906.

**70.** 935 P.2d 816 (Alaska 1997).

**71.** *Id.* at 821.

**72.** *Id.* at 819.

**73.** *Id.* at 821, 824–25.

**74.** *Id.* at 825 ("We have repeatedly rejected agencies' attempts to avoid the strictures of the APA by claiming their actions were general guidelines

or policy statements, rather than regulations.") (citing *Gilbert v. State, Dep't of Fish & Game*, 803 P.2d 391, 395–97 (Alaska 1990); *Kenai*, 628 P.2d at 904–06).

**75.** *Kachemak*, 935 P.2d at 825 (citing *Kodiak Seafood Processors Ass'n v. State*, 900 P.2d 1191, 1197 (Alaska 1995); *Gilbert*, 803 P.2d at 396).

**76.** *Id.* (quoting *Olson v. State, Dep't of Natural Res.*, 799 P.2d 289, 292 (Alaska 1990)).

**77.** *Id.* at 825–26 (citing *Olson*, 799 P.2d at 292) (emphasis added).

**78.** *Id.* at 826 ("For instance, the Commissioner does not identify by regulation those lands made available for oil and gas leases, mineral leases, or timber sales.") (citing AS 38.05.180(b), AS 38.05.135–175, and AS 38.05.115).

**79.** *Id.*

we have no reason to believe such a requirement was intended." [80]

We also quoted *Batterton v. Marshall*,[81] a 1980 decision by the United States Court of Appeals for the D.C. Circuit, which states:

> [M]any merely internal agency practices affect parties outside the agency—often in significant ways.... [E]ven office hours ... necessarily require conformity on the part of the public. A useful articulation of the exemption's critical feature is that it covers *agency actions that do not themselves alter the rights or interests of parties,* although it may alter the manner in which the parties present themselves or their viewpoints to the agency.[82]

Applying the *Batterton* principle—that agency action does not constitute a regulation if it does not itself "alter the rights or interests of [the] parties" [83]—we concluded:

> DNR's district identification decision affects the public in the limited manner discussed in *Batterton.* Whether DNR's identification of aquatic farm districts constituted a regulation as that term is defined in the APA presents a close question.... However, district identification does not alter the rights of the parties, does not deprive any party of a fair opportunity for public participation, embodies no finding as to a particular application and does not establish criteria by which particular applications should be evaluated.[84]

Instead, "[d]istrict identification [was] the first step in a lengthy, detailed public process of determining what aquatic farm will be allowed in what location." [85] As such we held that it did not satisfy the second indicium and therefore did not constitute a regulation under the APA.

## c. The BBAP affects the public in the limited *Kachemak/Batterton* sense.

The superior court in this case noted that in *Kachemak* we relied upon the fact that district identification "did not 'establish criteria by which particular applications should be evaluated,' which appears to be at odds with DNR's admission that the BBAP is the document by which it will be held accountable; the roadmap that will be referred to as future decisions are made." The superior court concluded that the BBAP is a regulation because it "implements the policy directives of AS 38.04.065, making it specific to the uplands of Bristol Bay, and *sets policy to guide the department when making land use decisions in the future."* (Emphasis added.)

While the Tribes and the superior court are correct that the BBAP does more than merely identify districts, the relevant inquiry is whether it does *enough* to meaningfully affect the public and thereby satisfy the second indicium of a regulation. We conclude it does not.

We begin by noting that the BBAP certainly "affects the public or is used by [DNR] in dealing with the public" [86] in a broad *Kenai* sense—namely that portions of the BBAP eventually may be implemented and thereby affect the public through regulations, and that the BBAP will likely guide public policy in years to come.[87] But we clarify today that, in light of our *Kachemak* decision, this nonspecific, downstream effect alone—that is, that an agency plan may eventually be implemented by regulation—is insufficient to demonstrate sufficient meaningful impact on the public to satisfy the second indicium of a regulation.

In *Kenai,* we found an effect on the public through both the emergency closure of the fishery and the fact that the policy dictat-

**80.** *Id.* (citing *Croft v. Pan Alaska Trucking, Inc.,* 820 P.2d 1064, 1066 (Alaska 1991)).

**81.** 648 F.2d 694 (D.C.Cir.1980).

**82.** *Id.* at 707 (emphasis added) (internal citations and quotation marks omitted).

**83.** *Kachemak,* 935 P.2d at 825 (quoting *Batterton,* 648 F.2d at 707).

**84.** *Id.*

**85.** *Id.* at 826.

**86.** AS 44.62.640(a)(3); *Kachemak,* 935 P.2d at 825.

**87.** *See Kenai Peninsula Fisherman's Coop. Ass'n, Inc. v. State,* 628 P.2d 897, 905 (Alaska 1981).

ed the substance of a later regulation.[88] We clarify that the first *Kenai* reason—the emergency closure—was sufficient to demonstrate a direct impact on the public and support our conclusion in that case that the agency actions were regulations.[89] The second *Kenai* reason—that the statements of management intent gave rise to later regulations—does not by itself necessarily dictate sufficient impact on the public to satisfy the second indicium.[90] We therefore now explicitly adopt the *Batterton* analysis as presented in *Kachemak* as the defining principle underlying the second indicium of a regulation: an agency action does not satisfy the second indicium if it "does not alter the rights of the parties, does not deprive any party of a fair opportunity for public participation, embodies no finding as to a particular application and does not establish criteria by which particular applications should be evaluated." [91]

The BBAP will be implemented and will affect the public chiefly through downstream "administrative actions such as leases, permits, land conveyances, classification orders, and mineral orders." Some land use plans in fact already have been adopted as regulations, and can presumably therefore be challenged under AS 44.62.300.[92] The BBAP has not. The BBAP is not itself "enforceable" against the public in a meaningful way until implemented by further agency action, and therefore cannot itself govern the conduct or rights of the public.[93]

The state land management process at issue here is similar to the *Kachemak* aquatic farm district identification because both in-

---

88. *Id.* at 905–06.

89. *Id.*

90. Regulations may cite to and even incorporate pre-existing guidelines and policy statements; this fact alone is insufficient to brand those earlier statements regulations as well. Regulations are open to judicial review at any time under AS 44.62.300. As such, so long as a properly promulgated regulation implements a policy that can be enforced against the public at some point, it is unnecessary to extend the classification of "regulation" any further upstream.

91. *Kachemak*, 935 P.2d at 825.

92. *See, e.g.*, Susitna Basin Recreation Rivers Management Plan, adopted as regulation at 11 AAC 09.005 (2005); Wood–Tikchik State Park Management Plan, adopted as regulation at 11 AAC 20.365 (2005).

93. *See also* DEPARTMENT OF NATURAL RESOURCES, BRISTOL BAY AREA PLAN FOR STATE LANDS 1–9 (2005), *available at* http://dnr.alaska.gov/mlw/planning/areaplans/bristol/index.htm (last visited Jan. 4, 2012) (titled "What the Plan Won't Do" and stating the BBAP is "not the only way in which land management goals are implemented" and does not regulate, for instance, public activities that do not require a written authorization on state land, such as "hiking, camping, boating, hunting, and fishing").
We also note that although it guides future DNR policy, the BBAP is likely not enforceable by the public against DNR either. The U.S. Supreme Court decision *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004), is instructive on this point. In *Norton*, plaintiffs brought suit to compel an agency to act in accordance with its land use plan. *Id.* at 67–69, 124 S.Ct. 2373. The Supreme Court declined to enforce the plan, stating that federal land use plans do not create "legally binding commitment[s]" even though they "guide and control future management actions ... for resources and uses." *Id.* at 69, 72, 124 S.Ct. 2373. The Court went on to state:
Of course, an action called for in a plan may be compelled when the plan merely reiterates duties the agency is already obligated to perform, or perhaps when language in the plan itself creates a commitment binding on the agency. But allowing general enforcement of plan terms would lead to pervasive interference with [the agency's] own ordering of priorities. For example, a judicial decree compelling immediate preparation of all of the detailed plans called for in the [plan at issue] ... would ultimately operate to the detriment of sound environmental management. Its predictable consequence would be much vaguer plans from [the agency] in the future—making coordination with other agencies more difficult, and depriving the public of important information concerning the agency's long-range intentions.
*Id.* at 71–72, 124 S.Ct. 2373. The BBAP similarly provides guidelines and does not mandate specific action. While the BBAP does, at times, contain mandatory language—for instance, it provides that "[a]ll state lands in the planning area *will be classified* consistent with the land use designations in this plan" (emphasis added)—classification "consistent with" the BBAP does not mandate a specific course of action. Anointing the BBAP and similar plans as regulations would not only make them subject to judicial review under AS 44.62.300, but also presumably to actions for enforcement of the type the U.S. Supreme Court declined to grant in *Norton*.

volve substantial DNR discretion in the early stages and later coalesce into actions affecting the public (e.g., permitting, disposal, leasing) through downstream agency action. Land use plans are an intermediate step in this process: statutes establish policies that land use plans must apply, and land use plans interpret these policies to guide the agency itself, but the public is directly affected only by later regulations and other agency action that may follow from the plans. Thus, the BBAP is an interim measure that guides DNR's behavior, not that of the public.

The Tribes argue that comparing the BBAP to the *Kachemak* district identification plan is incorrect. They assert the analogous "planning area identification" in Bristol Bay in fact antedated the BBAP and occurred in 1980, and they point out that whereas the *Kachemak* plan merely identified districts, the BBAP does considerably more than this by "establish[ing] goals, guidelines, policies, [and] standards of general application." The Tribes also cite various BBAP excerpts as purported evidence of its public impact. But the materials the Tribes cite on this point actually state that the BBAP *"guides DNR decisions,"* that *"DNR's actions will be based on the area plan,"* and otherwise suggest that the Plan at some future date will guide *DNR's actions* in dealing with the public— not that the Plan itself directly binds the public. (Emphasis added.) Moreover, DNR points out that although the Tribes repeatedly claim that the BBAP affects the public, they "fail to offer a single example of how the Plan has been applied to them, or any other member of the public, despite the fact that the Plan has been in place since April, 2005."

We based our *Kenai* decision in part on the fact that an emergency order based on a policy option had in fact closed down a fishery and thereby directly affected the public.[94] No such direct public impact is alleged here, and DNR persuasively argues that none could occur absent further agency action. The BBAP affects the public in a limited way—for instance, it may "alter the manner in which the parties present themselves or their viewpoints to the agency"[95]—but it does not itself "alter the rights or interests of the parties,"[96] and thus does not satisfy the second indicium of a regulation. We therefore hold that the BBAP is not a regulation under the APA.

## IV. CONCLUSION

Because it was error for the superior court to conclude that the Bristol Bay Area Plan is a regulation, we REVERSE the superior court's ruling that the BBAP is a regulation and REMAND for further proceedings consistent with this opinion.

FABE, Justice, not participating.

---

94. *Kenai Peninsula Fisherman's Coop. Ass'n, Inc. v. State,* 628 P.2d 897, 905–06 (Alaska 1981).

95. *Kachemak,* 935 P.2d at 825 (quoting *Batterton v. Marshall,* 648 F.2d 694, 707 (D.C.Cir.1980)).

96. *Id.* (quoting *Batterton,* 648 F.2d at 707).