*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| KATHRYN THOMASON, | ) | |
| | ) | Supreme Court No. S-18581 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-21-06060 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH AND SOCIAL | ) | No. 7741 – February 7, 2025 |
| SERVICES, DIVISION OF SENIOR | ) | |
| AND DISABILITIES SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani Crosby, Judge.

Appearances: Thomas A. Dosik, Thomas A. Dosik LLC, Anchorage, for Appellant. Paul R. Peterson, Assistant Attorney General, and Treg Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

CARNEY, Justice.

## I. INTRODUCTION

A personal care assistant (PCA) in a Medicaid program was investigated for submitting inaccurate records of services she provided. After an investigation substantiated the allegations, a committee of employees in the agency overseeing the

program determined that she should be terminated from the program. The PCA was notified of the determination and informed that she could appeal to an administrative law judge (ALJ). The ALJ recommended that the agency adopt the committee's determination, and the agency did. The PCA appealed to the superior court, which affirmed the agency's decision.

The PCA now appeals raising a number of issues. Because the agency complied with state law, did not deprive the PCA of due process, and supported its conclusions with substantial evidence, we affirm the superior court's decision upholding the agency's termination of the PCA.

## II. FACTS AND PROCEEDINGS

### A. Facts

Kathryn Thomason has cared for her stepson, who has severe medical needs, for many years. In 2011 Thomason was employed by Hearts and Hands of Care as a PCA for him. She was paid to provide care and "day habilitation" services through a federal Medicaid program administered through the Department of Health and Social Services. Day habilitation services provide opportunities to develop, retain, and mitigate the regression of "self-help, socialization, and adaptive" skills needed to live independently.[1]

In 2017 Hearts and Hands reported to the Department that they were having difficulty coordinating with the Thomason family regarding care and were concerned about "exploitation" of Thomason's stepson. An investigator with the Division of Senior and Disabilities Services referred the matter to the Medicaid Program Integrity office. The referral noted that some of the day habilitation activities she reported would have been impossible because the places Thomason claimed she had taken her stepson were closed or too far apart to be visited during the times indicated. The referral also noted that "the majority of" the day habilitation billing was

---

[1] *See* 7 Alaska Administrative Code (AAC) 130.260(b)(3).

for activities that did not qualify because they were "errands for the household." It also reported that Hearts and Hands workers "very rarely see [Thomason's stepson] outside of [the] car or doing any activity." The matter was then referred to the Medicaid Fraud Control Unit.

In March and April 2018, an investigator from the fraud unit monitored Thomason, including installing a camera on a utility pole opposite the family's home. The investigator reviewed Thomason's notes of day habilitation activities with her stepson and collected video from places Thomason claimed to have taken him. The investigator documented inaccuracies and impossibilities in the notes, as well as billings for times when Thomason was not providing day habilitation services. The investigator pointed out, for example, that there were seven days that Thomason wrote that she took her stepson to Fred Meyer as day habilitation when she did not. The investigator's report alleged that Thomason submitted over $3,800 in fraudulent billings to Medicaid during the investigation. The investigator also interviewed Thomason with her attorney present in September 2018.

In November 2018 Thomason and her husband were charged with felony medical assistance fraud, and in February 2019 Thomason alone was indicted for felony medical assistance fraud. Thomason's husband eventually pled guilty to a misdemeanor, and the charges against Thomason were dismissed.

The Department issued a "Report of Investigation" in September 2020. The report concluded that four allegations against Thomason had been substantiated: (1) that she "submitted timesheets for [personal care services] . . . not provided on multiple occasions between December 2017 and May 2018"; (2) that she "submitted services notes and timesheets for Day Habilitation services not provided in accordance with [conditions of participation] and regulations"; (3) that she "violated the terms of her Personal Care Assistant Agreement"; and (4) that she "failed to notify the personal care provider agency that she had been charged with a barrier crime." The Department also determined that evidence supported imposing sanctions under 7 AAC 105.400.

The report advised that an investigation review team and a sanctions committee had considered the factors required by regulation before imposing sanctions, and decided to sanction Thomason by terminating her from the program and issuing a public notice of the termination.[2] The report was mailed to Thomason on September 1, 2020; it provided that the sanctions would take effect on September 30, 2020 and included appeal instructions.

### B. Agency Proceedings

Thomason appealed to the Office of Administrative Hearings (OAH) on September 11, 2020. A hearing was held before an ALJ on October 9. Thomason appeared at the telephonic hearing without an attorney; the Department was represented by an assistant attorney general. Both the fraud unit and Department investigators testified, as did a member of the sanctions committee. The Department's witnesses described their investigation of Thomason and the deliberations of the sanctions committee in reaching its decision to sanction her and revoke her provider status. Thomason did not testify or present witnesses, but she did submit a written argument.

The ALJ issued a proposed decision upholding the agency's findings and sanctions in early February 2021. The ALJ noted that the Department's evidence in support of its allegations was "clear, credible, and essentially ultimately undisputed by Ms. Thomason." He agreed that the sanctions imposed were appropriate, and concluded that when "taking into account the entirety of the circumstances . . . Ms. Thomason's violations rose to a sufficient level of seriousness" to justify termination from the program.

The ALJ's proposed decision and information about how to appeal to the Department Commissioner were sent to Thomason on the same day. Three weeks later

---

**2**     *See* 7 AAC 105.420(b)(1)-(8). *See also* 7 AAC 105.410(a) (providing for 13 possible sanctions ranging from requiring sanctioned individual to complete further training to terminating individual from program).

Thomason submitted a "Proposal for Action Following Proposed Decision" that advocated for reversal of the agency decision or, at least, "additional OAH review and reconsideration." On March 22 the Commissioner's designee adopted the ALJ's decision without modification. Thomason appealed to the superior court.

## C.    Court Proceedings

Thomason, represented by counsel, argued that the Department violated the Open Meetings Act by convening the sanctions committee behind closed doors, and violated the Administrative Procedures Act (APA) by failing to promulgate regulations governing the sanctions process. She also argued that the Department denied her due process because it deprived her of property and liberty interests without a pre-deprivation hearing, and that it had not proved its allegations against her or shown that termination was an appropriate sanction.

The superior court held oral argument in June and issued an order affirming the agency's decision in November 2022. The court found that Thomason's Open Meetings Act claims were untimely and that the APA did not apply because the sanction procedures were interpretations of existing regulations, not regulations themselves. It also concluded that Thomason had no property interest in future reimbursements from the program, but reasoned that, even assuming she had a property interest in her status as a Medicaid provider, there was no deprivation of that status prior to her hearing before the ALJ and therefore no due process violation. It also determined that Thomason's liberty interest in her reputation was not implicated in the case. Finally, it found that substantial evidence supported the agency's factual findings and Thomason's termination from the program as a sanction.

Thomason appeals.

## III. STANDARD OF REVIEW

"When the superior court is acting as an intermediate court of appeal in an administrative matter, we independently review the merits of the agency or administrative board's decision."[3]

"When reviewing administrative decisions we use the 'substantial evidence' test for questions of fact and the 'reasonable basis' test for questions of law involving agency expertise."[4] The substantial evidence test is satisfied when there is "such relevant evidence as a reasonable mind might accept as adequate to support [the agency's] conclusion."[5] "We determine only whether such evidence exists and do not choose between competing inferences or evaluate the strength of the evidence."[6]

The reasonable basis test applies to the Department's exercise of discretion in imposing sanctions.[7] "When reviewing whether an administrative decision was reasonable, we ask 'whether there was a prejudicial abuse of discretion,' which we will find 'if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' "[8]

---

[3] *Griswold v. Homer City Council*, 310 P.3d 938, 940 (Alaska 2013) (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011)).

[4] *Fantasies on 5th Ave., LLC v. Alcoholic Beverage Control Bd.*, 446 P.3d 360, 366 (Alaska 2019) (quoting *Rollins v. State, Dep't of Pub. Safety*, 312 P.3d 1091, 1094 (Alaska 2013)).

[5] *French v. Alaska Oil & Gas Conservation Comm'n*, 498 P.3d 1026, 1028 (Alaska 2021) (alterations in original) (quoting *Shea*, 267 P.3d at 630).

[6] *Patrick v. Mun. of Anchorage, Anchorage Transp. Comm'n*, 305 P.3d 292, 297 (Alaska 2013) (quoting *Lopez v. Adm'r, Pub. Emps.' Ret. Sys.*, 20 P.3d 568, 570 (Alaska 2001)).

[7] *See Rollins*, 312 P.3d at 1094 ("[T]he 'reasonable basis' test applies to questions of law involving agency expertise.").

[8] *Fantasies on 5th Ave.*, 446 P.3d at 367 (quoting AS 44.62.570(b)(3)).

"Whether there was a violation of due process is a question of law, which we review de novo."[9]

## IV.   DISCUSSION

Thomason argues that the Department violated the Open Meetings Act and the APA, that it violated her due process rights by depriving her of property and liberty interests without a hearing, that the findings in support of its sanction decision were not supported by the evidence, and that the sanctions were unreasonable. We agree with Thomason that the revocation of her Medicaid provider status implicates a liberty interest in her reputation, but conclude that she was provided due process. We see no error in the balance of the superior court's decision, and we affirm its judgment upholding the Department's decision to terminate Thomason from the program.

### A.   The Open Meetings Act Claim Is Untimely.

The superior court concluded that the Open Meetings Act claim was untimely because Thomason did not file a lawsuit within 180 days of being notified of the sanctions on September 1, 2020. Thomason argues that she timely raised the claim because under the common law discovery rule, the limitations period did not begin to run until she learned about the sanctions committee meeting and the committee's operations at the hearing before the ALJ on October 9, 2020. She also argues that filing her appeal to OAH equitably tolled the limitations period for the Open Meetings Act claim. The Department argues that even if the claim did indeed accrue in October, it was still untimely. We agree with the Department.

Alaska's Open Meetings Act provides that "[a] lawsuit to void an action taken in violation of this section must be filed in superior court within 180 days after the date of the action."[10] Thomason did not appeal the ALJ's decision until April 27, 2021 — more than 180 days after the committee notified her of the sanctions. However,

---

[9]     *Patrick*, 305 P.3d at 297.

[10]     AS 44.62.310(f).

she argues the Open Meetings Act is subject to the "discovery rule", which we have adopted.[11] While a statute of limitations generally begins to run on the date that a claimant suffers harm,[12] under the discovery rule a cause of action accrues when the plaintiff has "information sufficient to alert a reasonable person to the fact that he has a potential cause of action."[13]

We have previously recognized the rule's application to tort and contract cases where a cause of action is established by statute.[14] In those cases we explained that the discovery rule may apply when the date of "accrual" is unclear from the statutory text.[15] If an element of a particular cause of action is not immediately apparent, we have held that "the date when the plaintiff has information sufficient to alert a reasonable person to begin an inquiry to protect his rights" is the applicable date for determining when the statute of limitations begins to run.[16] Under the discovery rule, Thomason argues her claim accrued when sanctions committee members testified to their activities at her ALJ hearing on October 9.

---

[11] *Christianson v. Conrad-Houston Ins.*, 318 P.3d 390, 396-97 (Alaska 2014).

[12] *See Arnoult v. Webster*, 480 P.3d 592, 597 (Alaska 2020).

[13] *Christianson*, 318 P.3d at 396-97 (quoting *Preblich v. Zorea*, 996 P.2d 730, 734 (Alaska 2000)).

[14] *See Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1275-77 (Alaska 2013) (considering application of discovery rule to derivative shareholder suit brought under AS 09.10.053); *see also Pedersen v. Zielski*, 822 P.2d 903, 908 (Alaska 1991) (evaluating discovery rule application to medical malpractice claim under AS 09.10.070).

[15] *See e.g.*, AS 09.10.070 ("a person may not bring an action . . . unless the action is commenced within two years of the accrual of the cause of action."); *see also* AS 09.10.053 ("Unless the action is commenced within three years, a person may not bring an action upon a contract or liability.").

[16] *Christianson*, 318 P.3d at 396 (quoting *Preblich*, 996 P.3d at 734).

However, the Open Meeting Act's unambiguous definition of accrual undermines the application of the discovery rule to a claim brought under the Act.[17] It requires a claimant file "[a] lawsuit to void an action taken in violation of this section . . . within 180 days after the date of the action."[18] The text clearly provides that a claim accrues when "an action taken in violation of" the Act occurs.[19] It is therefore unclear that the discovery rule should apply to a statutory cause of action with a clearly stated deadline.

We need not resolve whether the discovery rule applies to an Open Meetings Act claim, however. Even if Thomason's claim accrued when she learned of the sanctions committee's activities through the testimony at the ALJ hearing on October 9, it was still untimely because she did not appeal the ALJ's decision until 20 days after the limitations period had run.

Thomason argues that "regardless of the exact date the limitation period began to run," it was equitably tolled because her administrative appeal on September 11, 2020 placed the Department on notice that she was pursuing an alternate remedy. In order to equitably toll the statute of limitations a plaintiff must show "three elements: '(1) pursuit of the initial remedy must give defendant notice of plaintiff's claim, (2) defendant's ability to gather evidence must not be prejudiced by the delay, and (3) plaintiff must act reasonably and in good faith.' "[20] The superior court determined that

---

[17] *See Rotkiske v. Klemm*, 589 U.S. 8, 13-14 (2019) (declining to apply discovery rule to action brought under Fair Debt Collection Practices Act when statute "unambiguously set[] the date of the violation as the event that starts" the limitations period because "[t]o do so is not a construction of [the] statute, but, in effect, an enlargement of it by the court.").

[18] AS 44.62.310(f).

[19] *Id.*

[20] *Kaiser v. Umialik Ins.*, 108 P.3d 876, 881-82 (Alaska 2005) (quoting *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d 881, 886 (Alaska 2004), *overruled on other*

equitable tolling did not apply because Thomason did not allege a violation of the Open Meetings Act in her administrative appeal and instead raised the issue for the first time in her January 2022 briefing to the superior court.

Thomason asserts that she met the requirements for equitable tolling because her administrative appeal placed the Department on notice that she was seeking relief, that the delay did not prejudice the Department's opportunity to gather evidence, and that she acted reasonably and in good faith. But Thomason's "pursuit of the initial remedy" — the filing of her appeal with the superior court in April 2021 — did not give the Department notice that she was pursuing relief under the Open Meetings Act because she did not mention it in that appeal. Only in her January 2022 brief to the superior court did Thomason first argue that the Department violated the Open Meetings Act, well after the 180-day limitations period had expired. The superior court did not err by finding that Thomason's Open Meetings Act claim was untimely.[21]

### B. The Department Complied With The APA.

Thomason also argues that the sanctions committee violated Alaska's APA.[22] She contends that the existence of the sanctions committee itself goes so far beyond statutory and regulatory confines that its existence requires new regulations. She also argues that the informal procedures the committee used are inadequate and need to be formally promulgated. The Department responds that the sanction process is a lawful manner of carrying out existing regulations and additional regulations are not required. The superior court concluded that the APA did not apply; we agree.

---

*grounds* by *Buntin v. Schlumberger Tech. Corp.*, 487 P.3d 595, 603-07 (Alaska 2021)) (internal brackets omitted).

[21] We therefore do not reach her argument that the Open Meetings Act applied to the sanctions committee.

[22] *See* AS 44.62.010-.950.

We begin with Thomason's argument that the Department was required to promulgate regulations to create the sanctions committee. She argues that the superior court erred by finding that using the sanctions committee to determine sanctions was just an "interpretation of how to implement the regulations as a whole." Thomason contends that the Department must promulgate regulations under the APA before using a committee to decide whether and what sanctions to impose. The Department responds that the sanctions committee was a "commonsense way of carrying out" the existing regulations providing for sanctions,[23] and that it was not required to promulgate new regulations to establish a process to decide and impose sanctions.

"Although the definition of 'regulation' is broad, it does not encompass every routine, predictable interpretation of a statute by an agency."[24] Drawing on the APA's own definition of regulation,[25] we first consider whether an agency's action "implements, interprets, or makes specific the law enforced or administered by the agency."[26] We then consider whether the action "affects the public or is used by the

---

[23] *Exxon Mobil Corp. v. Dep't of Revenue*, 488 P.3d 951, 956 (Alaska 2021) ("Obvious, common sense interpretations of existing law are not regulations under the APA."); *see* 7 AAC 105.400 (grounds for sanctioning providers); 7 AAC 105.410 (enumerating sanctions that may be imposed); 7 AAC 105.420(b) (enumerating factors to be considered in sanction decision).

[24] *Smart v. State, Dep't of Health & Soc. Servs.*, 237 P.3d 1010, 1017 (Alaska 2010) (quoting *Alyeska Pipeline Serv. Co. v. State, Dep't of Env't Conservation*, 145 P.3d 561, 573 (Alaska 2006)).

[25] The APA defines a regulation as "every rule, regulation, order, or standard of general application . . . adopted by a state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure, except one that relates only to the internal management of a state agency." AS 44.62.640(3).

[26] *Chevron U.S.A., Inc. v. Dep't of Revenue*, 387 P.3d 25, 36 (Alaska 2016) (quoting *State, Dep't of Nat. Res. v. Nondalton Tribal Council*, 268 P.3d 293, 300-01 (Alaska 2012)).

agency in dealing with the public."[27]  But recognizing that this definition could "result in complete ossification of the regulatory state," we have clarified that "obvious, commonsense interpretation[s] of statutes" are not regulations.[28]  And we have "explained that agency actions may not be 'commonsense interpretations' of existing laws (1) when the agency adds 'requirements of substance' . . . (2) when the agency interprets a statute in a way that is 'expansive or unforeseeable'; or (3) when the agency 'alters its previous interpretation of a statute.' "[29]

The superior court concluded that the Division's actions were a commonsense interpretation "of how to implement the [relevant] regulations as a whole."  Thomason responds that even "extremely sensible procedure[s]" are still not "commonsense" if they are "expansive or unforeseeable."  Both parties cite *Smart v. State, Department of Health and Social Services*,[30] in which we concluded that a particular method used to calculate payments was a commonsense interpretation of the requirement that the State use "statistically valid sampling methodologies."[31]  We reasoned that the method chosen was a formula "appear[ing] in all statistics books," that it imposed no new substantive requirements, and that its use would not lead to a meaningful risk that the agency would vary its audit requirement "at whim" or be based on "improper influences."[32]

---

[27]    *Id.* (quoting *Nondalton*, 268 P.3d at 300-01).

[28]    *Id.* (quoting *Alyeska Pipeline Serv. Co.*, 145 P.3d at 573).

[29]    *Chevron U.S.A.*, 387 P.3d at 36-37 (citing *Alyeska Pipeline Serv. Co.*, 145 P.3d at 573) (quoting *Alaska Ctr. for the Env't. v. State*, 80 P.3d 231, 244 (Alaska 2003)).

[30]    237 P.3d 1010 (Alaska 2010).

[31]    *Id.* at 1017-18.

[32]    *Id.* at 1018.

Whether the use of the sanctions committee is a "commonsense interpretation" of the relevant law is a closer question than the use of a particular "statistically valid sampling methodolog[y]."[33] We conclude that it is; the Department was not required to promulgate regulations before creating and using the sanctions committee. We reach this conclusion for several reasons. First, the use of a committee adds no new substantive requirement to the existing regulations, which already outline 42 grounds for sanctioning providers, 13 sanctions to select from, and 8 factors to consider before imposing sanctions.[34] The committee selects from the options provided by the regulation to reach its decision.[35] Second, and as the Department argues, it is commonsense to expect that investigations, preparation of a written report, and a decisional meeting would be carried out through the use of a committee. Finally, the fact that a group of employees would take on these tasks as a committee is neither unforeseeable nor expansive when the grounds for imposing sanctions, the types of sanctions, and factors to consider are specified by regulation.[36]

Thomason separately argues that the sanctions committee violates the APA because its procedures "are not contained in properly promulgated regulations." She contends that the closed-door meetings are impermissible under existing regulation. The Department responds that the regulations — which list factors to be considered, broadly permit "the department" to impose sanctions, and outline the right to an appeal

---

[33]     *Id.*

[34]     *See* 7 AAC 105.400-.420.

[35]     *Cf. Chevron U.S.A., Inc. v. Dep't of Revenue*, 387 P.3d 25, 38-39 (Alaska 2016) (noting that "it is not uncommon for there to be multiple ways to read a given phrase in a statute without adding any additional substantive terms or requirements" and that formal rulemaking is not required where agency "did not add anything to the . . . [s]tatute that was not present in the statute's existing language").

[36]     *See id.* at 39 (finding it is "foreseeable" that agency would use its discretion to respond to new circumstances).

— are sufficiently detailed. We agree that the Department did not have a duty to promulgate regulations regarding the sanctions committee's procedures.

In *Sisters of Providence v. Department of Health and Social Services*, we rejected an argument that the Department "was required to adopt regulations establishing specific procedures" for how it would decide whether a given project was "substantially implement[ed]."[37] We explained that such regulation would be required when a separate statute specifically imposed a "mandatory duty" to promulgate such standards and procedures.[38] In the absence of an affirmative duty, we held that the "use of [an] informal . . . procedure was reasonable and the lack of published procedural regulations did not invalidate [the agency's] . . . decision."[39]

Thomason does not point to any statute or regulation requiring the Department to promulgate procedural regulations for the sanctions committee, and we see no such requirement. In the absence of an affirmative duty to do so, the Department was not required to establish formalized procedures for the sanctions committee's operation.[40] The superior court did not err by concluding the Department complied with the APA.

## C. Thomason Was Not Deprived Of Due Process.

Thomason next argues that the Department violated her due process rights by depriving her of property and liberty interests without a pre-deprivation hearing. She

---

[37] 648 P.2d 970, 977-78 (Alaska 1982).

[38] *Id.* at 977. In *Sisters of Providence* we distinguished two cases in which we held an agency was required to promulgate procedural regulations: *Mukluk Freight Lines, Inc. v. Nabors Alaska Drilling, Inc.*, 516 P.2d 408 (Alaska 1973), and *U.S. Smelting, Refining & Mining Co. v. Loc. Boundary Comm'n*, 489 P.2d 140 (Alaska 1971). Existing law in both *Mukluk* and *U.S. Smelting* imposed an affirmative duty to promulgate a procedural regulation, whereas no law imposed that duty in *Sisters of Providence*, 648 P.2d at 977.

[39] *Id.* at 978.

[40] *Id.* at 977-78.

also argues that the hearing she was provided was insufficient to provide due process because it was before an ALJ instead of the sanctions committee.

### 1. Thomason had a protected liberty interest in her reputation.

The superior court determined that Thomason likely had a property interest in her status as a Medicaid provider. But it rejected Thomason's argument that she was deprived of a liberty interest in her reputation because the termination of her provider status related to her professional performance, rather than her moral character. The court instead accepted the Department's assertion that the sanctions were unlikely to affect her employment prospects and "that reputation is not as important in the field of direct services."

Thomason argues that the court improperly relied on the Department's unsupported claim that reputation did not matter in the field of direct services, and that it was error to find that she had no liberty interest in her reputation given the nature of the allegations against her and the fact she was being terminated from the program due to those allegations. The Department argues that the allegations applied only to her "professional responsibilities, not her personal character," because the Department did not "flatly call her a dishonest person" in its notice of termination, but left it "for others to decide whether these allegations point toward any general dishonesty."

We have recognized reputational harm implicating constitutionally-protected liberty interests in a number of contexts. We have determined these reputational interests are infringed upon where a negative government job evaluation "impugn[s] [a terminated employee's] honesty, integrity, or morality."[41] In *State, Department of Military and Veterans Affairs, Alaska National Guard v. Bowen*, we held that a national guardsman's discharge for "misconduct" related to job responsibilities

---

[41] *Revelle v. Marston*, 898 P.2d 917, 926 (Alaska 1995).

was "sufficiently stigmatizing to implicate a liberty interest."[42]   We have also recognized that dismissal from a graduate education program for "unprofessional behavior" that "fell short of the standards for retention" would "sufficiently stigmatize[] a person's professional reputation in a chosen career field to constitute an infringement of a liberty interest."[43]   And in *McMillan v. Anchorage Community Hospital*[44] we observed that the summary termination of a physician's staff privileges based on allegations that his "disruptive" and "abrasive" behavior affected the quality of patient care could create "a stigma of medical incompetence."[45]   The Ninth Circuit, too, has recognized that reputational harm can implicate a liberty interest where it is accompanied by a tangible loss, such as the loss of a license.[46]

---

[42]   953 P.2d 888, 900-01 (Alaska 1998).  The *Bowen* appellant was alleged to have "failed to timely and properly respond to allegations of personal financial irregularities" and to have mishandled a leave request.  *Id.* at 891-92.  We reasoned that "in today's sophisticated marketplace, it is reasonable to conclude that prospective employers understand the language and importance of [military discharge forms]."  *Id.* at 900-901.

[43]   *Nickerson v. Univ. of Alaska Anchorage*, 975 P.2d 46, 52 (Alaska 1999); *see also Nichols v. Eckert*, 504 P.2d 1359, 1364 (Alaska 1973) (holding for-cause dismissal from graduate program implicates liberty interest because it can have "adverse effect" on professional reputation).

[44]   646 P.2d 857, 864 (Alaska 1982).

[45]   *Id.*; *see also Brandner v. Providence Health & Servs.—Washington*, 394 P.3d 581, 597 (Alaska 2017) (holding that hospital was required to give physician pre-termination hearing before terminating staff privilege for non-emergency reasons).  *But see Ramsey v. City of Sand Point*, 936 P.2d 126, 132-33 (Alaska 1997) (holding there was insufficient reputational harm to implicate liberty interest where police chief's at-will employment was terminated by city council following community accusations of excessive force).

[46]   *See, e.g.*, *Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762, 776 (9th Cir. 2022) ("[A] plaintiff who has suffered reputational harm at the hands of the government may assert a cognizable liberty interest for procedural due process purposes if the plaintiff suffers stigma from governmental action plus alteration or extinguishment of

Thomason's reputation was harmed by her termination from the Medicaid program, thereby implicating a protected liberty interest. The Department determined her conduct warranted the loss of her status as a Medicaid provider, and took action to revoke that status. Although the Department argues that it did not "flatly call her a dishonest person," one can infer that Thomason had committed some act or omission warranting dismissal from a position of trust.[47] Termination "impugn[ed] [Thomason's] honesty, integrity, [and] morality" by signaling to others that the Department terminated her from being a Medicaid provider for cause.[48] We agree with Thomason that this reputational harm implicated her protected liberty interests.

Thomason's liberty interest thus is implicated here in addition to her property interest in her provider status. We next consider "whether the procedure afforded her was sufficient to meet due process dictates."[49]

### 2. Thomason received an adequate pre-deprivation hearing.

Thomason argues that her procedural due process rights were violated because she did not have "the opportunity to be heard by the decisionmaker with discretion, before a decision [was] made." She argues that ". . . due process requires

---

'a right or status previously recognized by state law.' ") (quoting *Humphries v. Cnty. of L.A.*, 554 F.3d 1170, 1185 (9th Cir. 2009) *rev'd in part on other grounds*, 562 U.S. 29 (2010)).

[47] *See, e.g.*, *Nichols*, 504 P.2d at 1364. We also address the superior court's conclusion that accusations of reporting violations that "relate to [Thomason's] performance . . . as a Medicaid provider" "do not impose a stigma of moral turpitude". The circumstances that gave rise to this case exemplify the importance of character in the field of direct services — Thomason cares for her stepson who is disabled and requires a high level of care. We disagree with the assumption that a person's character is irrelevant in an occupation whose members care for some of Alaska's most vulnerable individuals.

[48] *Revelle v. Marston*, 898 P.2d 917, 926 (Alaska 1995).

[49] *Patrick v. Mun. of Anchorage, Transp. Comm'n*, 305 P.3d 292, 298-99 (Alaska 2013).

[that] the Sanctions Committee [instead of the ALJ] hear from Ms. Thomason." Thomason also argues the Department's procedures were insufficient because notice of her impending termination was sent to each Medicaid recipient she cared for, interested state agencies, and other entities as required by regulation before she received a hearing.**50**  The Department asserts that the hearing before the ALJ was sufficient to preserve Thomason's due process rights.

Both the United States and Alaska constitutions provide that "[n]o person shall be deprived of life, liberty, or property, without due process of law."**51**  "Due process requires that any action involving deprivation of life, liberty or property by adjudication must be preceded by notice and opportunity for hearing appropriate to the nature of the case,"**52** but "does not require any specific type of hearing."**53**  We use the test set forth by the United States Supreme Court in *Mathews v. Eldridge*,**54** which requires balancing three factors to determine whether due process was provided:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the

---

**50**  Thomason also asserts, in a single sentence without citation to authority, that "this regulation is inherently unconstitutional."  An argument that is "contained in a single conclusory sentence, without citation to any authority" is inadequately briefed and we will not consider it.  *Wagner v. Wagner*, 218 P.3d 669, 678 (Alaska 2009).

**51**  Alaska Const. art. I, § 7; U.S. Const. amend. XIV, § 1.

**52**  *Patrick*, 305 P.3d at 299 (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 264 P.3d 842, 846 (Alaska 2011)).

**53**  *Id.*

**54**  *See Native Vill. of Kwinhagak v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 542 P.3d 1099, 1120 (Alaska 2020) (looking to *Mathews v. Eldridge* test to evaluate procedural due process argument); *see also Patrick*, 305 P.3d at 299-301 (same).

additional or substitute procedural requirement would entail.[55]

Thomason first argues that the hearing she received before the ALJ could not have satisfied due process because the ALJ was not the "actual decision maker[]." She argues that due process demands that she have a hearing before the sanctions committee as the final decisionmaker — but the cases she cites do not support this proposition.[56]  Rather than addressing hearings that were deficient for due process purposes because presiding officers lacked discretion to render a determination in those cases, the cases she cites involve circumstances where parties were deprived of a protected interest before receiving any hearing at all,[57] or lacked sufficient notice of an impending hearing affecting their protected interests.[58]  The discretion of those who preside over a hearing was not directly implicated in those cases.

Thomason next argues that she did not receive a pre-deprivation hearing in this case because her reputation was damaged by the Department's September 1 letter stating that it would revoke her status as a Medicaid provider effective September 30. That letter was sent to her stepson, other individuals to whom Thomason provided care in the previous 12 months, and interested state agencies and professional organizations. Thomason argues that the letter's negative implications as to her reputation are as

---

[55]     *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

[56]     Thomason cites *Frontier Saloon, Inc. v. Alcoholic Beverage Control Bd.*, 524 P.2d 657 (Alaska 1974); *Brandner v. Providence Health & Servs.—Washington*, 394 P.3d 581 (Alaska 2017); and *City of Homer v. Campbell*, 719 P.2d 683 (Alaska 1986).

[57]     *Frontier Saloon*, 524 P.2d at 660 (rejecting argument that no hearing was required because Saloon owner's conviction for allowing minor on premises was sufficient to also adjudicate licensure termination based on existence of conviction); *Brandner*, 394 P.3d at 588-90 (holding physician should have received hearing prior to summary revocation of surgical privileges).

[58]     *City of Homer*, 719 P.2d at 686 (affirming superior court finding that party lacked notice of hearing where deprivation occurred).

damaging as the stigma from the summary revocation of hospital privileges in *Brandner*,[59] or the discharge from the National Guard at issue in *Bowen*.[60]

Thomason analogizes the September 1 letter from the Division to the summary loss of status in *Brandner* and *Bowen*, arguing that her reputation was harmed upon dissemination of that letter, which occurred prior to her October 9 hearing before the ALJ. But there is a key distinction between Thomason's case and the cases she cites. We determined the stigma had attached in those cases due to the implications flowing from the actual loss in status and the stated reasons for that loss — not communications indicating that such a loss was to occur in the future.[61]

Thomason also argues that she was deprived of the property interest in her Medicaid provider status as of September 30, based on the letter's indication that the sanction would come into effect on that day. She argues that this constituted an additional deprivation before a hearing. But Thomason appealed the sanction, and controlling regulations therefore stayed the revocation of her status until the ALJ's decision became final.[62] The ALJ's decision was issued in February 2021, well after Thomason's hearing in October 2020.

---

[59]    *Brandner v. Providence Health & Servs.—Washington*, 394 P.3d 581, 589-90 (Alaska 2017).

[60]    *State, Dep't of Mil. and Veterans Aff's, Alaska Nat'l Guard v. Bowen*, 953 P.2d 888, 900-01 (Alaska 1998).

[61]    *See Bowen*, 953 P.2d at 900-01; *Brandner*, 394 P.3d at 589-90. The Ninth Circuit's requirements to show a party had suffered reputational harm implicating their due process rights bolster our recognition of this important distinction. Though we do not today adopt its formulation, the Ninth Circuit requires plaintiffs to show that they "suffer[ed] stigma from governmental action plus alteration or extinguishment" of a right or status recognized by state law. *Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762, 776 (9th Cir. 2022).

[62]    *See* 7 AAC 105.440(b) ("The proposed sanction is effective 30 days after the date on the notice if the provider does not request an appeal . . . or 30 days after the date of the final administrative appeal decision upholding the proposed sanction.").

Because Thomason has protected interests in her Medicaid provider status and in her reputation, she was "entitled to some form of hearing appropriate to the circumstances before revocation, absent an emergency situation or a public safety concern requiring summary action."[63] Although there is an important governmental interest in ensuring Medicaid beneficiaries receive the care to which they are entitled, the record does not reflect that Thomason posed an immediate threat to her stepson. Some level of review was therefore necessary before the Department revoked her provider status.[64]

We conclude the procedures used by the Division were adequate to protect Thomason's rights. On the one hand, it is possible that conducting a full evidentiary hearing prior to notifying interested individuals that a Medicaid provider has been sanctioned could prevent an erroneous deprivation of property or liberty interests. On the other hand, the "probable value" of conducting such a hearing is small. The sanctioning decision in this case was preceded by months of investigation, including an interview between Thomason and a Department investigator in September 2018. And requiring a full evidentiary hearing prior to even notifying a Medicaid recipient that a PCA could no longer provide care would limit the Department's ability to ensure that recipients are being cared for.

If a recipient were not informed of the possible need to seek another PCA before learning that another PCA was necessary, the recipient could be left without a care provider. A recipient surprised by a PCA's sudden unavailability might be unable to find friends or family to fill in until another PCA could begin to provide care. Or a care agency, suddenly informed that its employee could no longer serve as a PCA effective immediately, might be unable to ensure that PCA's clients' needs were met.

---

[63] *Patrick v. Mun. of Anchorage, Anchorage Transp. Comm'n*, 305 P.3d 292, 299 (Alaska 2013) (internal citations and emphasis omitted).

[64] *See id.*

The State has a strong interest in ensuring that interested parties are informed of a given PCA's inability to work as a PCA beyond a certain date.

Thomason's case is akin to *Patrick v. Municipality of Anchorage, Anchorage Transportation Commission*.[65] In *Patrick*, the plaintiff's chauffeur's license was revoked by the Anchorage Transportation Commission because it believed she had accumulated sufficient violations to be deemed a "chronic violator"; Patrick disputed the factual basis of that conclusion, and requested an administrative hearing before a hearing officer.[66] We concluded that she was afforded due process because she had the opportunity to rebut the evidence against her and present evidence in support of her own case before the hearing officer, even if the officer was not a member of the commission with final authority.[67] Here Thomason had an OAH hearing before an ALJ at which she was able to present her own evidence, call witnesses, and rebut the evidence against her. Because Thomason received an adequate hearing in which she was able to represent her own interests before the revocation of her Medicaid provider status, we conclude the Department did not violate her due process rights.

## D. Substantial Evidence Supports The Department's Findings And Decision.

Lastly Thomason challenges the sufficiency of the evidence supporting the Department's decision to impose sanctions on her and the propriety of imposing sanctions at all. She argues first that the Department's findings were not supported by the evidence. She next argues that the decision to terminate her status was not justified by the eight factors listed in the relevant regulation. The superior court concluded that

---

[65]    305 P.3d 292 (Alaska 2013).

[66]    *See id.* at 295-96.

[67]    *See id.* at 299.

the administrative decision was supported by substantial evidence in the record.[68]  It also concluded that termination was appropriate, finding that the testimony at trial "reflect[ed] that the committee considered each regulatory factor."

We review factual findings in an administrative appeal under the substantial evidence standard, which is satisfied when there is "such relevant evidence as a reasonable mind might accept as adequate to support [the agency's] conclusion."[69] "We determine only whether such evidence exists and do not choose between competing inferences or evaluate the strength of the evidence."[70]  And "[w]hen reviewing whether an administrative decision was reasonable we ask 'whether there was a prejudicial abuse of discretion,' which we will find 'if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' "[71]

---

[68]  The Department determined that evidence existed to impose sanctions on Thomason on six different grounds under 7 AAC 105.400.  *See* 7 AAC 105.400(1) ("presenting or causing to be presented for payment any false or fraudulent claim for services or supplies"); (6) ("engaging in a course of conduct or performing an act the department considers deceptive or abusive of the Medicaid program . . ."); (7) ("breaching the terms of the Medicaid provider agreement or failure to comply with the terms of the provider certification on the Medicaid claims form"); (10) ("violating any provision of AS 47.07 or any regulation adopted under it"); (38) ("failing to perform an act that is within an individual's competence and training that is necessary to prevent harm or an increase in the risk of harm to a recipient"); and (41) ("failing to maintain for each recipient, as required under 7 AAC 105.230 or another provision of 7 AAC 105-7 AAC 160, a contemporaneous and accurate record of the services provided").

[69]  *French v. Alaska Oil & Gas Conservation Comm'n*, 498 P.3d 1026, 1028 (Alaska 2021) (alterations in original) (quoting *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 630 (Alaska 2011)).

[70]  *Patrick*, 305 P.3d at 297 (quoting *Lopez v. Adm'r, Pub. Emps.' Ret. Sys.*, 20 P.3d 568, 570 (Alaska 2001)).

[71]  *Fantasies on 5th Ave., LLC v. Alcoholic Beverage Control Bd.*, 446 P.3d 360, 367 (Alaska 2019) (citing AS 44.62.750(b)(3)).

The Department's first two allegations against Thomason are that she "submitted timesheets for [personal care] services not provided on multiple occasions between December 2017 and May 2018" and "submitted services notes and timesheets for Day Habilitation services not provided in accordance with [conditions of participation] and regulations." Thomason does not deny that her timesheets may have been inaccurate; she instead argues that the Department failed to prove that "she did not provide the services at all." But the Department did not need to prove Thomason provided no care at all — only that the records she submitted included timekeeping for care that was not actually provided, in violation of agency rules and regulations.[72] The record contains substantial evidence, including Thomason's own concession, to support the conclusion that she submitted inaccurate records indicating that certain services had been provided when they were not.

The Department's third allegation is that Thomason "violated the terms of her Personal Care Agreement" because she failed to report to the Department that she had been charged with a felony, as required by that agreement, and had provided inaccurate billings. Thomason does not deny that she failed to notify the Department of the pending felony charge, as required by her personal care agreement. She argues instead that "[e]ven if she failed to do so, this was an inconsequential error at most" because the Department was already investigating her. But 7 AAC 105.400 expressly provides that "[b]reaching the terms of the Medicaid provider agreement" is a sanctionable offense.[73] This finding is supported by substantial evidence.

The Department's fourth allegation against Thomason is that she "failed to notify the personal care provider agency that she had been charged with a barrier

---

[72] *See* 7 AAC 105.400(7, 41).

[73] 7 AAC 105.400(7).

crime" in violation of regulation.[74]  In her written argument to the ALJ, Thomason asserted she had informed Hearts and Hands that she had been charged with a barrier crime, but a Department employee testified that Hearts and Hands was not informed. The ALJ ultimately found that Thomason did not notify Hearts and Hands.  "When we review factual findings in an administrative appeal we do not choose between competing inferences or evaluate the strength of the evidence."[75]  Substantial evidence supported the ALJ's conclusion that Thomason failed to notify Hearts and Hands that she had been charged with a barrier crime.

Thomason's final argument is that the sanctions imposed by the Department were inappropriate.  She argues the sanctions committee did not "consider the sanctions in any meaningful manner."  We review this discretionary decision to impose sanctions under the reasonable basis standard and ask "whether there was a prejudicial abuse of discretion."[76]

7 Alaska Administrative Code 105.420 requires the Department to consider eight factors in selecting which sanction, if any, to impose.[77]  Thomason challenges the Department's weighing of these factors in making its sanctions decision. But the regulation requires that the enumerated factors be considered in the deliberative

---

[74]      *See* 7 AAC 125.120(g)(1).  That provision in turn references 7 AAC 10.905, which lists barrier crimes, including Medical Assistance Fraud.  *See* 7 AAC 10.905(c)(11).

[75]      *Patrick*, 305 P.3d at 297.

[76]      *Fantasies on 5th Ave.*, 446 P.3d at 367.  *See* AS 44.62.570(b)(3).

[77]      *See* 7 AAC 105.420(b)(1)-(8).  These factors are "(1) seriousness of the offense; (2) extent of violations; (3) history of prior violations; (4) prior imposition of sanctions; (5) prior provision of provider education; (6) provider willingness to obey program rules; (7) whether a lesser sanction will be sufficient to remedy the problem; and (8) actions taken or recommended by peer-review groups or licensing boards."

process, not that the factors be weighed in a particular manner.[78] The record supports that the committee accounted for each factor in deciding to impose sanctions. Although Thomason also contends that the factual circumstances do not support the sanctions, that argument depends upon our agreement that there was not substantial evidence to support the Department's sanctioning decision. But substantial evidence supported the findings that Thomason's conduct was sanctionable. We therefore agree with the superior court that substantial evidence supported the Department's findings and that the sanctions were not unreasonable.

## V. CONCLUSION

The superior court's decision is AFFIRMED.

---

[78] *Id.* ("The department will consider the following factors in determining the sanction to be imposed . . . .").